**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

GENOSOURCE, LLC,

        Plaintiff,

vs.

INGURAN, LLC, *d/b/a* SEXING
TECHNOLOGIES,

        Defendant.

No. 18-cv-113-CJW-KEM

**OPINION**

_____

### TABLE OF CONTENTS

I.   INTRODUCTION................................................................................. 2

II.  FACTUAL BACKGROUND ............................................................... 3

III. ANALYSIS.......................................................................................... 6

  A.  Arbitrability .................................................................................. 6

  B.  Temporary Restraining Order Versus Preliminary Injunction ................... 8

  C.  The Propriety of a Temporary Restraining Order ................................. 9

    1.  Likelihood of Success on the Merits ........................................... 10

    2.  Threat of Irreparable Harm........................................................ 15

    3.  Balance of Harms .................................................................... 19

    4.  Public Interest......................................................................... 21

  D.  Balance of all Factors.................................................................... 22

IV.  BOND .............................................................................................. 23

V.   CONCLUSION ................................................................................. 25

# I. INTRODUCTION

This matter is before the Court on plaintiff's Motion for Temporary Restraining Order and Preliminary and Mandatory Injunction. (Doc. 11). Plaintiff seeks a "temporary restraining order and subsequent preliminary injunction barring defendant Inguran LLC d/b/a Sexing Technologies ("ST")" from: (1) taking any further action to market or sell plaintiff's Holstein cattle or their genetic materials; and (2) engaging in actions that could injure or harm those animals and materials. (Doc. 11, at 1). Plaintiff further seeks a "preliminary mandatory injunction" requiring defendant to quarantine plaintiff's animals, release them to plaintiff, and provide any paperwork necessary for their transportation to plaintiff's facility in Iowa. (*Id.*). On Friday, November 9, 2018, the Court held a hearing on the portion of plaintiff's motion seeking a temporary restraining order, preserving to a later date consideration of plaintiff's prayer for a preliminary mandatory injunction. Both parties offered argument on plaintiff's motion for a temporary restraining order and, although presented with the opportunity to offer testimony, declined to do so.

On November 9, 2018, following the hearing, the Court granted plaintiff's motion for a temporary restraining order and held as follows:

> Defendant Inguran, LLC (d/b/a Sexing Technologies), its officers, agents, assignees, servants, employees and attorneys, and all persons in active concert or participation with any of the foregoing, including distributors and agents, who receive actual notice of this Order by personal service or otherwise, are hereby temporarily restrained from:
> (1) marketing, offering to sell, or selling any of the 40 animals ("the Cattle") identified on Exhibit A to the Declaration of Tim Rauen (Doc. 11-5, at 16-17);
> (2) marketing, offering to sell, or selling any genetic material, including, but not limited to, bull semen, oocytes, and embryos, obtained from the aforementioned Cattle;
> (3) taking any action to extract and/or collect any genetic material from the Cattle;

      (4) taking any action or omission that could injure, kill, or
           threaten the health of the Cattle, their genetic material, or
           their reproductive capabilities; and

      (5) moving the Cattle and their genetic material from the states
           in which the Cattle and the genetic material are currently
           located.

(Doc. 28, at 1-2). In addition, the Court imposed a $50,000.00 bond, payable by plaintiff. (*Id.*, at 2). In the Temporary Restraining Order, the Court stated that the reasons for issuing the Temporary Restraining Order would "be more fully explained in a subsequent order." (*Id.*, at 1). This Opinion provides the further explanation to which the Temporary Restraining Order referred.[1]

## II.    *FACTUAL BACKGROUND*[2]

On October 25, 2018, plaintiff filed its complaint in this Court alleging a single count of conversion. (Doc. 1). Plaintiff is in the cattle business and generates its revenue primarily from selling milk from its dairy cows. (*Id.*, at 1). Plaintiff generates additional revenue from the sale of cattle out of its commercial herd, the sale of genetic materials and/or genetically superior cattle, and from other services provided to dairy farmers and breeders. (*Id.*, at 1-2).

In support of its conversion claim, plaintiff alleges that defendant currently has possession of forty Holstein cattle and certain genetic materials from the cattle. (*Id.*, at 4). Defendant is housing these cattle and genetic materials in various locations across

---

[1] For the sake of simplicity, this Opinion refers to the question of whether a temporary restraining order should be granted as being presently unanswered.

[2] The Court's findings of fact in this Opinion are provisional and are not binding at trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (holding that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits"); *United States Sec. and Exch. Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) (same).

the country. (*Id.*, at 13). Plaintiff alleges that the cattle and genetic materials are owned by plaintiff and that defendant is "exercis[ing] wrongful dominion and control" over those cattle and genetic materials by refusing to release the cattle and genetic materials to plaintiff. (*Id.*, at 4). Additionally, plaintiff argues that defendant has unilaterally slaughtered certain of plaintiff's cattle without consulting plaintiff and without plaintiff's consent. (*Id.*, at 13).

Defendant, on the other hand, argues that it has a possessory right to the cattle and that defendant's possessory interest in the cattle is superior to any claim of interest plaintiff may have in the cattle. (Doc. 23, at 3). Specifically, defendant states that it operates a successful cattle breeding program under the Nature's Finest Joint Venture Agreement ("JV Agreement") and that plaintiff is a member of the joint venture. (*Id.*). As an alleged party to the JV Agreement, defendant argues that plaintiff granted defendant a possessory interest in the cattle at issue and that plaintiff cannot withdraw its cattle from the program without first following certain contractually provided steps. (*Id.*, at 3-4). Plaintiff asserts that it is not a party to the JV Agreement. (*See* Doc. 1, at 3-4). Although defendant acknowledges that plaintiff never signed the JV Agreement, defendant argues that plaintiff became a party to the JV Agreement through other means, including through plaintiff's conduct. (Doc. 23, at 4).

The object of the joint venture is to develop "exclusive, high quality lineages of bulls, whose genetic characteristics are superior to any other on the market." (*Id.*, at 3). In furtherance of this purpose, defendant collects semen from bulls that are owned by parties to the JV Agreement, then sorts that semen according to sperm cells that contain X chromosomes and sperm cells that contain Y chromosomes. The "sexed semen" can then be used to fertilize an egg. Sex sorting semen drastically increases the likelihood of the resulting offspring being one specific gender. The sexed semen is extremely valuable,

both for its value as being sexed and for the superior genetic qualities of the sperm in the semen.

Defendant markets and sells both sexed semen and conventional (unsexed) semen to the public and splits the profits with the owner of the cattle that furnished the semen. Although plaintiff contends that it is not a party to the JV Agreement, plaintiff admits that this process of sex-sorting semen, then marketing and selling both conventional and sexed semen, took place with the cattle at issue, and that plaintiff received proceeds from the sale of such genetic materials.

Some of the genetic materials that defendant collects from cows and bulls is used to create additional cattle with superior genetic characteristics. Defendant contends that the offspring of cattle that were a part of the JV program are, likewise, born into the JV program. Certain of the cattle at issue are offspring of animals that are either in the JV program or are alleged to be in the JV program. Defendant therefore contends that those cattle are a part of the JV program.

Plaintiff contends that it is attempting to expand its business to permit plaintiff to perform the sex sorting and fertilization that defendant currently performs. Doing so will allow plaintiff to eliminate defendant as a provider of necessary services. Further, plaintiff characterizes this expansion as the natural next step in its business model. As such, plaintiff asserts that its current customer base and business relationships will remain relevant to the expanded portion of the business.

Plaintiff's motion for a temporary restraining order and for a preliminary injunction is now before the Court. (Doc. 11). As is detailed more fully *infra*, defendant resists plaintiff's motion for injunctive relief. (Doc. 23). Further, defendant has brought a Motion to Dismiss or Stay Litigation and Compel Arbitration, in which defendant argues that the Federal Arbitration Act requires the Court to submit this case to arbitration. (Doc. 24). Defendant further argues that the Court should decide the motion

to compel arbitration prior to deciding whether to grant injunctive relief. (Doc. 23, at 9).

## III. ANALYSIS

The questions before the Court are whether the Court should enter a temporary restraining order barring defendant from: (1) taking any further action to market or sell plaintiff's Holstein cattle or their genetic material; and/or (2) engaging in actions that could injure or harm those animals and their genetic material. In answering these questions, the Court must first differentiate between the temporary restraining order and the preliminary injunctive relief plaintiff seeks. Next, the Court must apply the factors determinative in deciding whether a temporary restraining order is appropriate. Finally, should the Court find a temporary restraining order appropriate, it must determine whether bond should be required and, if so, the amount of that bond. The Court will first address the issue of arbitrability, then will turn to each remaining issue in turn.

### A. Arbitrability

As an initial matter, defendant urges the Court to first decide the issue of arbitrability before turning to either plaintiff's request for a temporary restraining order or preliminary injunction. (Doc. 23, at 9). If the Court were to first consider the motions for injunctive relief, defendant argues, the Court would be forced to consider the merits of the underlying dispute in deciding plaintiff's motion for a temporary restraining order. (Doc. 23, at 9-10, n.3). Based on defendant's argument that this case should be decided by an arbitrator, as opposed to a court, defendant further argues that the Court is prohibited from considering the merits of the underlying dispute. (*Id.*).

The Court disagrees that this is a case where the Court should first decide the issue of arbitrability before turning to the requests for injunctive relief. Defendant has not produced any evidence showing that there is a written contract between the parties. Indeed, defendant concedes that there is no contract that has been *signed* by the parties,

but nonetheless maintains that plaintiff became a party to a written contract with defendant by plaintiff's actions, and that the aforementioned contract contains an arbitration provision. (Doc. 25-1, at 22-24). In support, defendant turns to *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1291-92 (8th Cir. 1984), in which the Eighth Circuit held that where the Federal Arbitration Act requires a dispute to be resolved through arbitration, the grant of "injunctive relief abrogates the intent of the Federal Arbitration Act and consequently [is] an abuse of discretion." Importantly, however, in *Hovey*, the Eighth Circuit established the existence of a written contract between all necessary parties before proceeding to the next step of the arbitrability inquiry. *Id.* at 1287-89. Here, the Court has not been presented with evidence that would support such a finding at this stage.

Further, *Hovey* was decided on a motion for a preliminary injunction, whereas the instant case is before the Court strictly on plaintiff's motion for a temporary restraining order. *See id.* at 1291. Motions for a temporary restraining order are frequently before the Court at an earlier stage than motions for a preliminary injunction, carry with them a greater sense of urgency than do motions for a preliminary injunction, and seek only a short-term remedy. In *Hovey*, the Eighth Circuit was not called upon to determine whether the urgency that accompanies a motion for a temporary restraining order permits a district court to rule on the motion for a temporary restraining order prior to considering a pending motion to compel arbitration. Indeed, the Court has been able to find no binding authority—and defendant has presented no such authority—holding that the Court cannot properly consider a motion for a temporary restraining order prior to considering a pending motion to compel arbitration.[3] The urgent nature of plaintiff's motion for a

---

[3] The Court recognizes that because temporary restraining orders are not immediately appealable orders, circuit courts do not have the opportunity to opine on issues surrounding temporary restraining orders as frequently as circuit courts are able to opine on issues surrounding preliminary injunctions.

temporary restraining order counsels that plaintiff's motion should be decided with expediency; in this case, that means plaintiff's motion for a temporary restraining order required a decision before the parties could have a full and fair opportunity to develop their positions on defendant's motion to compel arbitration.

Here, the parties agree that there is no signed instrument between the parties. Although defendant argues that plaintiff agreed to an arbitration provision by plaintiff's conduct, plaintiff resists this assertion and has offered evidence purporting to show that the parties never came to terms on a contract, which, plaintiff argues, shows that the parties never entered into a valid agreement to arbitrate. The Court is not prepared to foreclose defendant's argument that the parties entered into a valid arbitration agreement. At this early stage, however, the Court finds that it would be premature to decide the merits of the arbitration issue. It would be more appropriate to decide the merits of the issue once the parties have had a full opportunity to brief the issue and provide evidence and testimony regarding the issue.[4] As such, the Court declines to decide the issue of arbitrability before deciding the issue of plaintiff's motion for a temporary restraining order.

### B.  *Temporary Restraining Order Versus Preliminary Injunction*

As described above, plaintiff seeks both a temporary restraining order and a preliminary injunction. At this time, the Court will entertain only the portion of the motion that concerns the temporary restraining order. "[I]t is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors, which were set forth the in the seminal

---

[4] *See Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 591 n.3, 592 (8th Cir. 1984) (upholding the district court's decision to grant a preliminary injunction while a motion to compel arbitration was pending even where the district court "found that there was sufficient evidence to show the existence of an arbitration agreement and its enforceability to allow [the district court] to conclude that there was a substantial question presented as to that issue").

decision in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*)." *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp.2d 1014, 1031 (N.D. Iowa 2008).

In differentiating a temporary restraining order from a preliminary injunction, a court must consider factors such as: "(1) whether the hearing was *ex parte* or adversarial; (2) whether the adversarial hearing allowed the basis for relief to be strongly challenged; (3) whether the order expired, by its own terms, within the [fourteen] days provided by Rule 65(b); and (4) the 'substance' of the order." *Id.*, at 1032 (time period altered to reflect an updated version of Rule 65). Here, the Court did not hold an *ex parte* hearing, but, rather, held an adversarial hearing where both parties were present. The Court again notes that although neither party chose to present testimony at the hearing, both parties were invited to do so, which indicates that the adversarial hearing allowed the basis for relief to be strongly challenged. Further, the scope of the Temporary Restraining Order that the Court entered was narrow and would expire after twenty-four days, which is within the maximum time period set forth in Rule 65. (*See* Doc. 28). The Court is therefore satisfied that the Temporary Restraining Order that the Court entered is, in fact, a temporary restraining order.

### C. The Propriety of a Temporary Restraining Order

The movant bears the burden of establishing the propriety of a temporary restraining order. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). As set forth above, in determining whether to grant a temporary restraining order, the Court is to consider the *Dataphase* factors, which are: (1) the movant's probability or likelihood of success on the merits; (2) the threat of irreparable harm or injury to the movant absent the injunction; (3) the balance between the harm to the movant in the absence of injunctive relief and the harm that the injunction's issuance would inflict upon other interested parties; and (4) the public interest. *Dataphase*, 640 F.2d at 114. "No

single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh toward[ ] granting the injunction." *Baker Elec. Co-op., Inc.*, 28 F.3d at 1472 (citation and internal quotation marks omitted). The Court will address each factor in turn.

## 1.    Likelihood of Success on the Merits

If the movant has failed to show that it is likely to succeed on the merits, this is a strong suggestion that preliminary injunctive relief should be denied. *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). The Eighth Circuit has explicitly rejected the notion that the phrase "probability of success on the merits" should be read to mean that a movant can "prove a greater than fifty [percent] likelihood that he will prevail on the merits." *Dataphase Sys., Inc.*, 640 F.2d at 113.[5] More recently, the Eighth Circuit has explained that in cases not seeking to enjoin "government action based on presumptively reasoned democratic processes," courts should "apply the familiar 'fair chance of prevailing' test" to assess whether a movant has a likelihood of success on the merits. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008).

The nature of deciding a motion for injunctive relief, being a balance of equities, permits entitlement to relief where a movant makes a strong showing as to certain of the factors to be considered, but makes a lesser showing as to whether the movant is likely to succeed on the merits. *Dataphase Sys., Inc.*, 640 F.2d at 113. The Eighth Circuit

---

[5] *But see Dataphase Sys. Inc.*, 640 F.2d at 115 (Ross, J., concurring):

> Neither do I agree that the term "probability of success" does not necessarily mean a greater than fifty percent likelihood that the requesting party will prevail. If the courts which have used that phrase did not mean it to imply a better chance of prevailing than of not prevailing, they would have used the word "possibility" or another word of similar meaning. I cannot agree to this illogical exercise in semantics.

Court of Appeals has further held that "where the balance of [factors other than likelihood of success on the merits] tips decidedly toward plaintiff[,] a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." *Id.*

Plaintiff has brought a single claim of conversion, which does not implicate any governmental action or entity. (*See* Doc. 1). Thus, the Court need only assess whether plaintiff has a "fair chance" of prevailing on the merits of its conversion claim. *Planned Parenthood Minn., N.D., S.D.*, 530 F.3d at 732-33. The "fair chance of prevailing" test "asks only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation and . . . does not require a strict probabilistic determination of the chances of a movant's success when other factors, for example irreparable harm, carry substantial weight." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053-54 (8th Cir. 2014) (citations omitted).

The parties agree that this case presents the potential for a conflict of laws issue, and plaintiff asserts that Iowa law could govern this case (Doc. 11-3, at 15 n.7; Doc. 23, at 13-14). The parties also agree, however, that each body of law that could potentially govern this case—including Iowa law—has the same elements and standards for a conversion claim and that no material differences are present in the various bodies of law that could govern. As such, the Court will apply Iowa law for purposes of assessing plaintiff's likelihood of success on the merits. *See Leonards v. S. Farm Bureau Cas. Ins. Co.*, 279 F.3d 611, 612 (8th Cir. 2002) (declining to resolve a conflicts of law issue where the conflict was a "false conflict").

Iowa law defines conversion as "the wrongful control or dominion over another's property contrary to that person's possessory right to the property." *Blackford v. Prairie Meadows Racetrack and Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010) (citations and internal quotation marks omitted). "The essential elements of conversion are: (1)

ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant; (2) exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto; and (3) damage to plaintiff." *Matter of Estate of Bearbower*, 426 N.W.2d 392, 394 n.1 (Iowa 1988) (citations omitted).

As the Court understands plaintiff's complaint, plaintiff's claim of conversion is based on (1) defendant allegedly slaughtering animals over which plaintiff contends plaintiff had sole ownership and possessory rights; (2) defendant allegedly retaining possession of animals over which plaintiff contends it has sole ownership and possessory rights; and (3) defendant allegedly retaining possession of genetic material of cattle, which genetic material plaintiff contends plaintiff has sole ownership and possessory rights. (Doc. 1, at 13-14). To assess plaintiff's likelihood of success on the merits of plaintiff's conversion claim, the Court must consider plaintiff's likelihood of success based on each of the three aforementioned actions that gave rise to plaintiff's claim for conversion.

At this early stage, the Court has not been presented with all relevant evidence, and the parties have not yet introduced testimony on the relevant issues, including whether the parties entered into either an oral or written contract. As a result, the record is limited. The limited record before the Court has a noticeable impact on the Court's ability to fully consider the merits of defendant's argument that plaintiff entered into the JV agreement by plaintiff's actions. Indeed, although defendant has argued that plaintiff entered into the JV agreement by plaintiff's actions, the evidentiary record before the Court contains little to no support for defendant's argument and, instead, establishes only that plaintiff did not sign a contract to enter into the JV agreement. (*See* Doc. 11-4, at 7-13).

The Court recognizes that defendant may have had—and may continue to have—some possessory right in the cattle and genetic materials at issue. The record before the Court, however, establishes only that plaintiff owned, and continues to own, the cattle and genetic materials at issue, and that defendant has no contractual right of possession. (*Id.*, at 14-17). Based on the evidentiary showing that plaintiff has an ownership interest in the cattle and genetic materials at issue, and based on the lack of record evidence showing that defendant has any ownership or possessory interest in the cattle and genetic materials at issue, the Court concludes, based on the record before it, that plaintiff has an ownership right in the cattle and genetic materials that is greater than the ownership or possessory right defendant may have in the cattle and genetic materials. *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000) (recognizing the relevance of record evidence in determining whether a party has shown a likelihood of success on the merits). The first element of plaintiff's claim for conversion is therefore satisfied.[6]

Having found that the first element of plaintiff's conversion claim is satisfied and that the evidentiary record does not support defendant's claim of a possessory interest in the cattle and genetic materials at issue, the Court likewise finds that the second element of plaintiff's conversion claim is satisfied. Plaintiff's rights, as owner of the cattle and genetic materials at issue, include the right to possess and use the cattle and genetic materials, and the right to exclude others from using the cattle and genetic materials. *3M Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 858 F.3d 561, 566-67 (8th Cir. 2017) (citations omitted). It is undisputed that the living cattle and genetic materials at issue are currently in defendant's possession. Plaintiff, in demanding that the living cattle and

---

[6] The Court notes that even if the Court were to apply one of the four other bodies of law defendant advances as potentially governing plaintiff's conversion claim, the result would be the same. (*See* Doc. 23, at 13-14). This is consistent with defendant's statement at the hearing that defendant was of the belief that application of any one of the potentially governing bodies of law would lead to the same conclusion.

genetic materials be returned to plaintiff's possession, exercised one of plaintiff's rights of ownership in the cattle. In refusing plaintiff's demand, defendant exercised dominion and control over the cattle and genetic materials in a manner that was inconsistent with plaintiff's rights of ownership. *See Matter of Estate of Bearbower*, 426 N.W.2d at 394 n.1. Further, in slaughtering certain cattle, defendant deprived plaintiff of the ability to use the cattle as plaintiff saw fit, which was inconsistent with plaintiff's right to use its property. As such, the evidentiary record before the Court shows that the second element of plaintiff's conversion claim has been satisfied.

The Court finds that the record before the Court supports an ultimate finding that plaintiff has suffered and continues to suffer damages. Assuming plaintiff is able to prove the first two elements of its conversion claim, which the Court has already found plaintiff is likely to do, plaintiff would be entitled, at the very least, to the value of the animals and the genetic materials that were converted, whether those damages be for the total value of the animals and genetic material, or for the value of the animals and genetic materials to which plaintiff was deprived during the pendency of their conversion. Having found that all elements of plaintiff's claim for conversion have been satisfied, the Court finds that plaintiff has made a strong showing of its likelihood of success on its claim for conversion. The Court notes, however, that in light of the sparse evidentiary record before the Court, the showing that plaintiff is likely to succeed on the merits is not as strong as it would be if the parties had introduced the full breadth of relevant evidence and testimony that they intend to introduce. Nevertheless, plaintiff has made, at the very least, a "fair" showing that it is likely to succeed on the merits. *See 1-800-411-Pain Referral Serv., LLC*, 744 F.3d at 1053-54.

### 2. *Threat of Irreparable Harm*

To be entitled to injunctive relief, a movant must show that irreparable harm is *likely*, not merely possible, in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010). The Court may "find a likelihood of irreparable harm based on general principles," and "[p]art of the district court's discretion is assessing whether an alleged harm requires more substantial proof." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319-320 (8th Cir. 2009).

As the scope of plaintiff's motion for a temporary restraining order is more narrow than plaintiff's motion for a preliminary injunction, the Court will address only the irreparable harm that plaintiff would allegedly face if the Court were to deny the temporary restraining order that is sought.[7] Specifically, the Court will consider the likelihood of irreparable harm to plaintiff if defendant is permitted to (1) continue marketing and selling plaintiff's Holstein cattle and the genetic materials from the cattle, and (2) engage in actions that could injure or harm the animals or their genetic material, regardless of whether that genetic material has been collected from the animals. The Court will address the injury to the animals and their genetic materials prior to turning to the marketing and sale of the animals and/or their genetic materials.

---

[7] Defendant also argues that entry of a temporary restraining order would alter the status quo and should, therefore, be denied. (Doc. 23, at 20-22). In substantiating this argument, however, defendant turns to issues that are not being addressed in conjunction with the motion for a temporary restraining order, but, rather, are more appropriate for consideration with respect to the motion for a preliminary injunction. (*Id.*). The Court therefore reserves consideration of defendant's status quo argument until the Court rules on the motion for preliminary injunction.

The cattle at issue are valued, primarily, for their use in promoting genetic advancements. (Doc. 11-4, at 18-22). If the animals are harmed and are no longer able to procreate or facilitate procreation, their value will likely diminish considerably. (*Id.*, at 21-22). Although a monetary figure could be assessed to the animals' value as beef or dairy cows, assessing a monetary figure to the animals' potentially superior genetics, or ability to facilitate superior genetics, is not as easy to do. Doing so would essentially require assigning a monetary figure to the value of genetically advanced cattle. Although the Court is not prepared to foreclose this possibility entirely, plaintiff has shown that if would be difficult, if not impossible, to predict the value of a genetically advanced herd due to the number of variables involved and the inability to predict the exact genetic makeup of a heifer resulting from a single breeding. Indeed, when considering that a herd is comprised of cattle—meaning, more than one cow and/or bull—the number of variables involved multiplies, as does the number of potential genetic combinations that could result within the herd. The multiplication of these factors would, in turn, compound the difficulty of assigning a monetary value to a genetically advanced herd of cattle.

Likewise, plaintiff argues that if defendant is permitted to continue marketing and selling the cattle and the cattle's genetic materials, the superiority of the cattle's genetics would become diluted as more "superior" genetic materials are introduced into the market. (Doc. 11-3, at 19). This, in turn, plaintiff argues, would cause the cattle's genetic material to lose its marketability as being "exclusive." (*Id.*). Plaintiff asserts that this loss of exclusivity would harm its reputation as a bull stud business, and that the resulting reputational damage would be difficult, if not impossible, to calculate. (*Id.*). Similarly, plaintiff argues that if defendant is permitted to continue selling genetic materials from plaintiff's cattle, plaintiff will suffer a loss of goodwill from its customer base because of plaintiff's previous business relationship with defendant for the sale of

genetic materials. (*Id.*, at 19-20). The Court agrees that should defendant be permitted to continue marketing and selling the cattle's genetic materials, plaintiff would be likely to suffer harm to its reputation and, possibly, loss of goodwill.

Defendant's argument that plaintiff does have an adequate remedy at law as to the marketing and sale of the cattle and the cattle's genetic materials is limited to arguing that the terms of the JV agreement—to which defendant contends plaintiff is a party—govern defendant's ability to market the cattle and their genetic materials. (Doc. 23, at 15-16). This argument, however, does not address whether plaintiff would face irreparable harm, assuming plaintiff prevails on the merits. Otherwise stated, defendant offers an argument that plaintiff will not be able to prevail on the merits of its claim that defendant has and is improperly marketing the cattle and their genetic materials, but defendant does not address whether any harm plaintiff incurs would be reparable, assuming defendant's conduct is wrongful.

Likewise, defendant does not address whether any harm that may come to the animals or their genetic materials in the absence of equitable relief would be irreparable. Instead, defendant argues that the facts show that defendant has not mistreated or otherwise endangered the animals and that plaintiff, instead, has mistreated and endangered the animals. (*Id.*, at 16-17). Although this argument may be probative on plaintiff's likelihood of success on the merits, this argument is not probative on the issue of whether any potential harm plaintiff may incur would be irreparable.

Having determined that plaintiff is likely to be harmed if injunctive relief is not granted, the Court must now consider whether such harm would be irreparable. As to the issue of whether potential harm to the animals and/or their genetic materials would amount to irreparable harm, the Court has already found that it would, at the very least, be difficult to calculate the monetary loss associated with the loss of a genetically superior herd, or the loss of the opportunity to cultivate a genetically superior herd. Neither party

has advanced a theory of recovery that would permit plaintiff to recover for the potential harm at issue, and the Court can conceive of none on its own. Having found no colorable theory of recovery, the Court finds that a harm of this nature would be irreparable by money damages. *See Fogie v. THORN Americas, Inc.*, 95 F.3d 645, 654 (8th Cir. 1996) (finding irreparable harm where "[e]stimating future losses . . . is virtually impossible"). As such, the Court is satisfied that plaintiff would likely suffer irreparable harm if defendant is not enjoined from harming and/or destroying the animals and their genetic materials.

Reputational harm may also be irreparable. "Because damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief." *Kroupa v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013) (citation omitted). Here, plaintiff runs the risk of losing its reputation as a potential seller of genetic materials that have value. If the genetic materials of plaintiff's line of cattle become widely available, the resulting cattle would cease to be "superior" because, eventually, all cattle would share at least some of the same "superior" genetic characteristics as plaintiff's cattle. With each disbursement of the genetic materials, the genetic materials become more widely available, which could dilute the "superiority" of the resulting cattle. This, in turn, could lead to plaintiff having a reputation as only being able to market and sell genetic materials that are less "superior" than it would be able to market and sell if the genetic materials had not already been disbursed.

The Court finds that such reputational harm is likely to occur if defendant is permitted to continue marketing and selling the cattle and their genetic materials. Although the Temporary Restraining Order will only remain in effect for a fairly short period of time, each disbursement of the genetic materials threatens to harm plaintiff's reputation for being able to provide "superior" genetic materials. The Court finds that

this harm is likely to occur based on defendant's professed intention to continue marketing and distributing the genetic materials absent a temporary restraining order. The Court further finds that this harm would be irreparable.

Finally, defendant argues that plaintiff's "prior conduct and actions" are inconsistent with imminent harm. (Doc. 23, at 17). In support, defendant asserts that twenty-one days elapsed between defendant's "refusal to turn over the disputed animals" and the filing of plaintiff's motion for a temporary restraining order. (*Id.*). Further, defendant states that "[p]laintiff's unexplained delay further shows that [the] alleged future harm [plaintiff] seeks to prevent is not 'irreparable,' and that injunctive relief is not warranted." (*Id.* (footnote omitted)). Although the delay is potentially probative on the threat of irreparable harm and on the immanency of such harm, the Court finds that the delay in the instant case is not so great as to negate the finding that irreparable harm is likely to occur. At most, the delay reduces the likelihood of such irreparable harm occurring. Here, however, the Court is persuaded that even if the delay indicates a lesser likelihood of irreparable harm, the irreparable harm threatened is still sufficiently likely to occur that a temporary restraining order would be justified.

### 3.    *Balance of Harms*

Plaintiff and defendant each argue that the balance of harms weighs in favor of its respective position and, in so arguing, plaintiff and defendant each rely on similar rationales. Defendant's position is as follows:

> The bulls identified by [plaintiff] cannot be simply returned to [plaintiff] without causing irreparable harm to [defendant] and the Natures Finest JV. Those bulls were created with semen available exclusively to Natures Finest Members for the exclusive benefit of the Natures Finest Program. If [plaintiff] is able to take back its bulls and now sell semen products in competition with the JV, then the JV will lose its competitive advantage of being able to offer exclusive lineages of bull sperm. This will cost the JV countless dollars in revenue, and threatens the JV itself, which

is premised on the ability to market and sell the exclusive lineages of bull sperm.

(Doc. 23, at 18 (internal citations omitted)). During the hearing, defendant further elaborated upon the harm it would incur if injunctive relief were granted and explained that defendant would have to pull the genetic materials out of global circulation at great expense and difficulty.

Plaintiff, on the other hand, contends that in the absence of injunctive relief, plaintiff will be "handcuff[ed]" in its ability to expand its business, and that plaintiff will suffer reputational harm and loss of goodwill. (Doc. 11-3, at 18-19; *see also* Doc. 11-3, at 20-21). Further, plaintiff contends that "[defendant's] professed intention to continue to sell [plaintiff's] genetic materials undermines [plaintiff's] ability to market its genetics as exclusive—a key factor that drives value and ultimately, leads to the success or failure of an [artificial insemination] business." (*Id.*, at 19).

In the Court's view, defendant stands to incur approximately the same harm if injunctive relief is granted as does plaintiff if injunctive relief is denied. Both parties could suffer the loss of exclusivity of the genetic materials if the opposing party prevails on the claim for injunctive relief, and both parties stand to incur some degree of monetary damages if the other side prevails. For plaintiff, those damages would take the form of the lost opportunity to expand its business and, potentially, lost goodwill and reputational harm.

For defendant, those damages would be the costs associated with halting marketing and distribution of the genetic materials and of pulling the genetic materials out of distribution channels. Defendant also stands to incur lost profits that would have been realized during the pendency of a temporary restraining order.[8] It appears to the Court

---

[8] The Court notes that it intends for the temporary restraining order in the instant case to endure for a brief period of time. The lost profits defendant may incur should, therefore, not be as

that both parties are alleging similar premises for the harms they stand to incur, and, on balance, the Court sees no practical difference between plaintiff's potential lost opportunities and defendant's potential lost opportunities. The Court therefore finds that this factor weighs in favor of neither plaintiff nor defendant.[9]

### 4. *Public Interest*

Turning to the final factor, the Court finds that the public interest would be best served if the motion for a temporary restraining order were denied. In arguing that the public interest would be best served if the temporary restraining order were granted, plaintiff asserts that there is a public interest in avoiding confusion and misinformation as to whether defendant has the authority to market and distribute the genetic materials of cattle belonging to plaintiff, when plaintiff has terminated defendant's right to do so. Defendant contends that the public interest would be best served by permitting defendant to continue marketing the genetic materials and permitting the genetic materials to be available to the marketplace as the materials have been throughout the duration of plaintiff's business relationship with defendant.

The Court finds that the public interest tips slightly in favor of denying the temporary restraining order. The Court recognizes the merits of plaintiff's contention that the public interest would be served by avoiding misinformation and confusion as to whether defendant has a legal right to market and sell the genetic materials at issue. The

---

great as they would be if the Court were considering a motion for preliminary or permanent injunction, as such injunctions typically remain in place for a longer period of time than do temporary restraining orders. Further, although defendant has not yet been able to represent to the Court what percentage of defendant's total head of cattle are made up of the cattle at issue here, defendant has represented that the cattle at issue constitute neither a de minimis nor a majority portion of the total.

[9] During the hearing, defendant indicated that it believed the balance of harms was in equipoise because each party stands to incur the same harm if the other party prevails. This statement is consistent with the Court's finding.

Court also recognizes, however, that there is a significant public interest in allowing the genetics of cattle to become more advanced.

The temporary restraining order sought, and the temporary restraining order that the Court granted, is prohibitory in nature and does not require defendant to return the cattle or their genetic materials to plaintiff. (Doc. 28). As such, the temporary restraining order does not facilitate plaintiff marketing and selling the cattle or the subject genetic materials, but rather effectively prohibits such sales and marketing efforts altogether. (*Id.*). As a result, the public is precluded from having access to the cattle and genetic materials. The parties seem to agree that access to the genetic materials is necessary for the genetic advancement of the cattle. Thus, by limiting public access to the genetic materials, the temporary restraining order stunts the public's ability to better the genetics of cattle. Such a limitation on the ability to better the genetics of cattle is not in the public interest. The public interest factor therefore tips in favor of denying the temporary restraining order.[10]

### D.    Balance of All Factors

The final step in the Court's analysis of whether to grant the temporary restraining order is to consider the *Dataphase* factors together and to determine whether, on the whole, they weigh in favor of granting the temporary restraining order. Although the Court has found that plaintiff has a likelihood of success on the merits and that this factor weighs in favor of injunctive relief, the Court notes that at this early stage, the Court has a limited record upon which to base its finding of likelihood of success on the merits. As such, the likelihood of success on the merits factor does not weigh as heavily in favor of

---

[10] In addition to offering argument that the public interest weighs in favor of denying the temporary restraining order, defendant indicated a belief that the public interest factor is in equipoise and has no bearing on whether the temporary restraining order should be granted. The Court disagrees with defendant's assertion that the public interest factor is in equipoise and, instead, finds that the public interest factor weighs in favor of defendant's position.

granting injunctive relief as it could if the Court had a more developed record upon which to base its findings. The Court further finds that the threat of irreparable harm in the absence of an injunction weighs heavily on the side of granting injunctive relief. Together, the likelihood of success on the merits factor and the irreparable harm factor weigh more heavily in favor of granting injunctive relief than does the public interest factor on the side of denying injunctive relief. The balance of harms factor, although relevant, does not tip the scale in favor of either side. Having found that the balance of equities favors granting injunctive relief, the Court finds a temporary restraining order proper. The terms of the previously entered Temporary Restraining Order (Doc. 28) shall remain in full force and effect as set forth in the Temporary Restraining Order.

## IV. BOND

The final issue the Court must address is whether to impose a bond and, if so, the amount of that bond. Plaintiff asks the Court to exercise its discretion and not impose a bond or, alternatively, impose a "minimal" bond. (Doc. 11, at 2). Defendant requests that the Court impose a "substantial" bond, if the Court grants injunctive relief. (Doc. 23, at 22).

Subsection (c) of Rule 65 of the Federal Rules of Civil Procedure requires the movant to give security for the issuance of a preliminary injunction. *See* FED. R. CIV. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). "The bond posted under Rule 65(c) 'is a security device, not a limit on the damages [defendant] may obtain against [plaintiff] if the facts warrant such an award.'" *Branstad v. Glickman*, 118 F. Supp.2d 925, 944 (N.D. Iowa 2000) (quoting *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997)).

The language of Rule 65(c) is mandatory. In *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp.2d 943, 979-80 (N.D. Iowa 2006), this Court noted that courts were inconsistent on whether some security is always required before issuance of a preliminary injunction. Ultimately, however, the Court found that in light of the mandatory language of Rule 65(c), "'requiring a bond in some amount before issuing a preliminary injunction is far the better course.'" *Interbake Foods*, 461 F. Supp.2d at 979 (quoting *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1279 (N.D. Iowa 1995)). Further, "[a]lthough [the Eighth Circuit Court of Appeals] allow[s] the district court much discretion in setting bond, [it] will reverse [the district court's] order if [the district court] abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991) (citing *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)).

For the reasons articulated in *Interbake Foods*, the Court finds that the better course is to impose a bond. As to the amount of the bond, the Court finds that $50,000.00 is sufficient security to protect defendant against any harm incurred during the pendency of the Temporary Restraining Order, if the Temporary Restraining Order is found to have been improperly issued. The Court arrived at this figure by estimating the total lost profits that may be realized during the pendency of the Temporary Restraining Order. In doing so, the Court assumed, for the sake of calculating the bond amount, that the Temporary Restraining Order would last approximately one month. Plaintiff's portion of the profits from defendant's marketing and sale of the subject cattle and genetic materials from August through December 2017 was as follows:

| | |
|---|---|
| August 2017: | $16,449.75 |
| September 2017: | $2,613.75 |
| October 2017: | $25,240.00 |
| November 2017: | $20,202.50 |

|  | December 2017: | $6,463.50 |
|---|---|---|

(Doc. 22, at 77-78).

Although these figures are somewhat dated, these figures are the best information the Court has available to aid in calculating an appropriate bond. The figures set forth above represent fifty percent of the profits of the parties' endeavors. Defendant's costs in pursuing the business were subtracted from the total revenue prior to plaintiff's share of the proceeds being calculated. Thus, by doubling the figures set forth above, one arrives at the total profits realized in each of the aforementioned months. The profits in October 2017 were the highest out of all of the months for which the Court has data. The Court therefore finds that the $50,000.00 bond is adequate to protect defendant from any losses it may incur during the pendency of the Temporary restraining Order, should the Temporary Restraining Order later be found to have been wrongfully entered. Further, the Court finds that the $50,000.00 bond is not excessive in light of the circumstances of this case. The Court notes that plaintiff has already paid the bond, and plaintiff need not do so again.

## V. *CONCLUSION*

For the reasons set forth above, plaintiff's motion for a temporary restraining order (Doc. 11) has been **granted**. The specific terms of the Temporary Restraining Order are set forth herein and are contained in full at Docket Number 28.


**DATED** this 16th day of November, 2018.

_____
C.J. Williams
United States District Judge
Northern District of Iowa