**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| GENOSOURCE, LLC, | |
|         Plaintiff/Counter-Defendant, | No. 18-cv-113-CJW-KEM |
| vs. | **OPINION** |
| INGURAN, LLC, *d/b/a* SEXING TECHNOLOGIES, | |
|         Defendant/Counter-Plaintiff. | |
| INGURAN, LLC, *d/b/a* SEXING TECHNOLOGIES, | |
|         Third-Party Plaintiff, | |
| vs. | |
| HAWKEYE BREEDER SERVICES, INC., | |
|         Third-Party Defendant. | |

————————————

TABLE OF CONTENTS

I.      THE PARTIES ............................................................................. 2

II.     THE IOWA ACTION ................................................................... 4

III.    THE TEXAS ACTION.................................................................10

IV.   APPLICABLE LAW ...................................................................13

V.     DISCUSSION ..................................................................15

       A.    Parallel Proceedings .............................................16

             1.    Same Parties ..............................................16

             2.    Same Issues ...............................................17

       B.    Exceptions to the First-Filed Rule............................23

VI.    CONCLUSION ................................................................28

This matter is before the Court on GenoSource, LLC's ("GenoSource") Motion for Temporary Restraining Order and Preliminary Injunction. (*GenoSource v. Inguran*, 18-cv-113-CJW-KEM, Doc. 114 (N.D. Iowa) (hereinafter "*GenoSource*")). Inguran, LLC, d/b/a Sexing Technologies ("Sexing Technologies") timely resisted the motion. (Doc. 120). For the following reasons, the Court finds injunctive relief appropriate.

GenoSource seeks "a temporary restraining order and subsequent preliminary injunction barring [Sexing Technologies] from taking any further action to prosecute a duplicative and overlapping lawsuit" that Sexing Technologies filed in the Southern District of Texas ("Texas Action") against two of GenoSource's members. (Doc. 114, at 1). In support, GenoSource asserts that because the issues and claims in the Texas Action allegedly "overlap with and duplicate issues asserted in [the instant case] against GenoSource based on the same conduct of [the same individuals], the first-filed rule and general preference to avoid duplicative federal actions justifies an order enjoining Sexing Technologies from taking any further action to prosecute the Texas federal action." (*Id.*).

On February 26, 2019, the Court entered an Order providing as follows:

> For reasons that will be enumerated in a separate Opinion, Inguran, LLC, doing business as Sexing Technologies, is enjoined from taking any further action in, and from taking any action to prosecute, the action filed in the Southern District of Texas, bearing case number 4:19-cv-00574, and which is styled *Inguran, LLC dba Sexing Technologies v. Mark Butz, Tim Rauen*, pending further order of this Court.
>
> GenoSource, LLC is directed to transmit this Order to the Southern District of Texas and to ensure that the presiding judge receives *actual notice* of this Order.

1

(Doc. 122 (emphasis in original)). This Opinion is the "separate Opinion" to which the Court's February 26, 2019 Order referred, and this Opinion provides the basis for the Court's prior ruling.[1]

# I. THE PARTIES[2]

Plaintiff in the instant action ("the Iowa Action"), GenoSource, asserts that it "owns a large herd of Holstein dairy cattle, and it generates its revenue primarily from selling milk from its dairy cows, with additional revenue coming from . . . the sale of genetic materials and/or genetically superior dairy cattle." (Doc. 1, at 1-2).[3] Defendant in the instant action, Sexing Technologies, describes itself as follows:

> [Sexing Technologies] is a worldwide leader in sexed semen and embryo production for cattle. [Sexing Technologies] owns technology (and the intellectual property rights associated with that technology) that permits the separation of X (female) and Y (male) chromosomes from bovine

---

[1] For purposes of simplicity, the Court will refer to GenoSource's motion as if the motion has not yet been ruled upon.

[2] The descriptions of the parties set forth herein depict the parties as the Court currently understands them, by virtue of the Court's involvement with the parties' motions practice and by virtue of the evidence and argument that the parties have presented during the various hearings that have taken place up to this point. The Court recognizes, however, that despite the voluminous proceedings that have taken place thus far, this case is still at a relatively early stage. The Court's descriptions of the parties and the facts, then, are to be considered for purposes of the instant motion only and are not to be considered binding findings of fact. Third-party defendant Hawkeye Breeder Services, Inc. ("Hawkeye") is not discussed in this section because Hawkeye is not materially relevant to the motion presently before the Court.

[3] The Court notes that this citation is to GenoSource's original complaint. GenoSource filed a motion to amend its complaint and appended the proposed amended complaint to the motion. (Doc. 112). That motion is currently pending before the Court and is not contemplated herein. The original complaint will continue to be the operative complaint in the instant action until such time as the Court permits GenoSource to amend its complaint, if the Court permits GenoSource to do so.

spermatozoa.[4] [Sexing Technologies'] technology enables the sorting of semen and embryo production for enhanced cattle breeding. [Sexing Technologies] has developed proprietary technology enabling the sorting of sperm that helps develop better herds—cows that are healthier and produce more milk. [Sexing Technologies] also uses artificial insemination . . . or natural process to fertilize embryos in "donor" cattle, flush the embryos from the donors, and transfer the embryos to "recipients" that act as surrogates to carry the pregnancy. [Sexing Technologies] also markets and sells certain types of bull semen obtained from its own herd or from the bulls of other parties.[5]

(Doc. 113, at 2-3 (footnotes added)).

Mark Butz, of Butz-Hill Holsteins, and Tim Rauen, of TJR Genetics, are cattle breeders. (*Inguran v. Butz*, No. 19-cv-574, Doc. 1, at 3 (S.D. Tex.) (hereinafter "*Inguran*"); *see also GenoSource*, Doc. 113, at 25, 27). At some point before September 2014, Mr. Butz and Mr. Rauen, in their capacities as principals of Butz-Hill Holsteins and TJR Genetics, respectively, along with other cattle breeders, entered into contractual agreements with Sexing Technologies to "join forces to combine their higher genetic cattle lineage to produce a higher level lineage of cattle through a joint venture [p]rogram." (*GenoSource*, Doc. 83, at 26 (internal quotation marks omitted); *see also* Doc. 61-2, at 63-76 (contract signed by Mark Butz, as agent of Butz-Hill Holsteins, and ST)). This joint venture became known as the Nature's Finest Joint Venture ("Joint Venture"), and the series of contracts that the various cattle breeders signed became known as the "JV Agreement." (Doc. 113, at 26). Through the arrangement, certain cattle belonging to GenoSource, Mr. Butz, and/or Mr. Rauen came into Sexing

---

[4] The process of sorting semen according to X and Y chromosomes is known as "sex-sorting semen." The resulting semen is called "sexed semen."

[5] A business that sells bull semen is known as a "bull stud."

Technologies' possession for purposes of, *inter alia*, extracting genetic material and breeding those animals.

Mr. Butz and Mr. Rauen were intimately involved with Sexing Technologies' operations, both as corporate signatories to the Joint Venture, and by virtue of having been hired as consultants "with Natures Finest Breeders and [Sexing Technologies]." (*Id.*, at 29). Sexing Technologies asserts that Mr. Butz and Mr. Rauen "were hired for the primary purpose of establishing the [Joint Venture], managing the breeding protocols with the [Joint Venture], and marketing the high end genetic animals, cell lines, sperm and embryo[ ] products in accordance with the terms of the Joint Venture Agreements." (*Id.*). Sexing Technologies further asserts that each of the written consultant agreements contained a two-year non-competition provision that prohibited Mr. Butz and Mr. Rauen "from engaging directly or indirectly in activities or business transaction[s] which compete with the operations of the [Joint Venture], the Breeders or [Sexing Technologies], or results in a conflict of interest . . . ." (*Id.*, at 29-30).

All of those involved seem to agree that confidentiality is of paramount importance for the success of the Joint Venture and to Sexing Technologies' business. Through their involvement with Sexing Technologies and the Joint Venture, Mr. Butz and Mr. Rauen became privy to a great deal of allegedly confidential information and directly participated in making various decisions, such as deciding which bulls' semen should be sold to the public instead of maintained for use only by members of the Joint Venture. (*See, e.g.*, Doc. 113, at 46). These decisions, the parties have informed the Court, are integral to the success of Sexing Technologies and the Joint Venture.

## II.    THE IOWA ACTION

GenoSource filed its single-count complaint against Sexing Technologies in the Northern District of Iowa on October 25, 2018. (Doc. 1). On November 5, 2018,

GenoSource filed a motion for temporary restraining order and preliminary injunction, in which GenoSource sought injunctive relief barring ST

> from taking any further action to market or sell Holstein cattle owned by GenoSource and/or genetic material from those cattle and from taking any actions that could lead to injury or risk to the health of GenoSource's animals, and to enter a preliminary mandatory injunction requiring [Sexing Technologies] to quarantine GenoSource's animals, release them to GenoSource, and provide any paperwork necessary to permit the transport of those animals from ST's facilities to GenoSource's facility in Iowa.

(Doc. 11, at 1). On November 8, 2018, Sexing Technologies filed its resistance to GenoSource's motion for injunctive relief. (Doc. 23). That same day, Sexing Technologies filed a Motion to Dismiss or Stay Litigation and Compel Arbitration, arguing that GenoSource was a party to the Joint Venture Agreement, which contained an arbitration clause that Sexing Technologies sought to enforce. (*See* Docs. 24, 27). Sexing Technologies urged the Court to decide the motion to compel arbitration before considering GenoSource's motion for injunctive relief, but the Court declined to do so. In sum, the issues presented in the motion for injunctive relief and in the motion to dismiss were complex, both legally and factually.

On November 9, 2018, the Court held a hearing lasting approximately two hours on the two pending motions. (Doc. 29). Also on November 9, 2018, the Court granted GenoSource's motion for a temporary restraining order and imposed a $50,000.00 bond requirement in a summary Order. (Doc. 28). The bond was posted several hours later, at which point the Temporary Restraining Order went into effect. (*See* Doc. 28; unnumbered docket annotation dated November 9, 2018, reading "CASH BOND in the amount of $50,000 posted by TJR Genetics pursuant to [Temporary Restraining Order]."). On November 15, 2018, the Court held a hearing on GenoSource's motion for expedited discovery to permit GenoSource to better support its application for injunctive relief. (*See* Doc. 40). On November 16, 2018, the Court issued its Opinion

regarding the Temporary Restraining Order, and the Court issued an Order permitting GenoSource to engage in limited expedited discovery. (Docs. 39, 41).

The Court permitted the parties to file supplemental briefs on plaintiff's motion for a preliminary injunction (Docs. 47, 48, 64), and on November 30, 2018, the Court held a full day hearing on the motion for preliminary injunctive relief, the motion to compel arbitration, and a pending motion for discovery for alleged violations of the Temporary Restraining Order. During the hearing, the parties introduced a great deal of evidence and offered oral argument. (*See* Doc. 68). Before the November 30, 2018 hearing, the Court held a hearing on a motion to compel discovery to be produced in advance of the November 30, 2018 hearing. (*See* Doc. 62).

On December 6, 2018, the Court entered a Preliminary Injunction and imposed a $500,000.00 bond, payment of which would render the Preliminary Injunction effective. *GenoSource, LLC v. Inguran, LLC*, No. 18-cv-113-CJW-KEM, 2018 WL 6978126 (Dec. 6, 2018). The Preliminary Injunction concerned the same subject matter as the Temporary Restraining Order, but the Preliminary Injunction was not as broad in scope as the Temporary Restraining Order. In relevant part, the Preliminary Injunction prohibited Sexing Technologies from "[m]arketing, offering to sell, or selling" any of the animals that are at issue in the Iowa Action, and the Preliminary Injunction ordered Sexing Technologies to release the subject cattle to GenoSource. *Id.* at *20. On December 7, 2018, before the expiration of the Temporary Restraining Order, GenoSource posted the $500,000.00 bond by way of a cash bond. (*See* unnumbered docket text dated December 7, 2018). On December 10, 2018, GenoSource submitted a surety bond to the Clerk of Court in the amount of $500,000.00 as payment of the bond required by the Preliminary Injunction Order, and GenoSource sought to substitute the surety bond in place of the cash bond. (Docs. 75, 76). The Court granted the motion to substitute the surety bond for the cash bond. (Doc. 78).

On January 3, 2019, Sexing Technologies brought a resisted motion to redact portions of the preliminary injunction hearing transcript (Doc. 92), and the Court ruled on that motion on March 4, 2019 (Doc. 131). On December 11, 2018, Sexing Technologies brought a Motion to Recover on Temporary Restraining Order Bond, arguing that Sexing Technologies was wrongfully enjoined and was "entitled to recover the entire $50,000 bond set by the Court." (Doc. 77, at 1). On January 17, 2019, the Court denied Sexing Technologies' motion and found that the motion had been brought prematurely. (Doc. 95).

On December 20, 2018, Sexing Technologies filed its answer and affirmative defenses, counterclaims, and a third-party complaint against third-party defendant Hawkeye Breeder Services, Inc. (Doc. 83). Sexing Technologies' counterclaims and third-party complaint sought, *inter alia*, damages, declaratory relief, and injunctive relief. (*See* Doc. 83, at 77-78). GenoSource responded to Sexing Technologies' counterclaims with a partial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and with a partial answer. (Docs. 99, 101). Instead of filing a resistance to GenoSource's motion to dismiss, Sexing Technologies filed an amended answer and affirmative defenses, amended counterclaims, and an amended third-party complaint. (Doc. 113). On February 28, 2019, GenoSource filed a motion to dismiss defendant's amended counterclaims for failure to state a claim upon which relief can be granted, which seeks dismissal of most of the amended counterclaims that are asserted against GenoSource. (Doc. 124). GenoSource also filed an answer to those counterclaims for which GenoSource does not seek dismissal. (Doc. 126). The answer was filed contemporaneously with GenoSource's motion to dismiss. (Doc. 126). Both of GenoSource's motions to dismiss remain pending as of the filing of this Opinion.

Sexing Technologies asserts fourteen separate counterclaims (Doc. 113, at 47-84), states its intention to pierce the corporate veil between GenoSource and its members (*id.*,

at 84-86), and seeks preliminary and permanent injunctive relief (*id.*, *passim*). The fourteen counterclaims are as follows: I) Breach of Contract—JV Agreement (Texas Law) (Doc. 113, at 47-55); II) Breach of Oral/Separate Agreement (*id.*, at 55-58); III) Breach of Implied Covenant of Good Faith and Fair Dealing (Iowa Law) (*id.*, at 58-62); IV) Breach of Semen Purchase Contract (Texas Law) (*id.*, at 62-63); V) Tortious Interference (Texas Law) (*id.*, at 63-66); VI) Conversion (*id.*, at 66-67); VII) Promissory Estoppel (Texas Law) (*id.*, at 67-70); VIII) Unjust Enrichment/Restitution/Quantum Meruit (*id.*, at 70-71); IX) Declaratory Relief (*id.*, at 71-72);[6] XI) Fraud and Fraudulent Inducement (*id.*, at 73-81); XII) Breach of Confidential Relationship (*id.*, at 81-83); XIII) Equitable Accounting (*id.*, at 83-84); and XIV) Wrongful Injunction (*id.*, at 84).

Some of the counterclaims are based on Iowa law, some are based on Texas law, and some do not specify a supporting body of law. Sexing Technologies' counterclaims are based largely, if not entirely, on Mr. Butz's and Mr. Rauen's prolonged intimate involvement with Sexing Technologies and the Joint Venture, during which time Mr. Butz and Mr. Rauen became knowledgeable about the finances, strategy, and inner workings of both Sexing Technologies and the Joint Venture. Integral to Sexing Technologies' assertions is the idea that Mr. Butz and Mr. Rauen subsequently used the knowledge they gleaned by virtue of their relationship with Sexing Technologies and the Joint Venture to successfully form and operate GenoSource.[7]

---

[6] Count Ten also seeks declaratory relief. (Doc. 113, at 72-73). Count Ten is pleaded only as to Hawkeye, however, which is not materially relevant to the instant motion. Hawkeye has brought a motion to dismiss all claims asserted against Hawkeye under both the Counterclaim and the Amended Counterclaim. (Doc. 132).

[7] The Court finds abundant support for this reading of Sexing Technologies' Amended Counterclaim. *E.g.* Doc 113, at 39-40 ("Mr. Rauen has interacted extensively with [Sexing Technologies] on a wide range of topics . . ., including: breeding of [Joint Venture] animals; selection of bulls to enter into the Joint Venture [P]rogram; selection of [Joint Venture] Program semen to use to create more program animals; restrictions on the sale of semen products from

On February 8, 2019, GenoSource filed a resisted Motion for Leave to File Amended Complaint, with a proposed amended complaint that seeks to add a significant number of additional claims, and significant factual matter. (Docs. 112, 112-1). GenoSource's motion to amend its complaint remains pending as of the filing of this Opinion. On February 22, 2019, GenoSource filed the motion that is currently at issue (Doc. 114), and Sexing Technologies filed its resistance on February 25, 2019 (Doc. 120). On February 26, 2019, the Court held a hearing on the motion, which hearing lasted approximately forty minutes, and the Court issued its Order on the motion that same day. (*See* Docs. 121, 122).

---

[Joint Venture] Program bulls to keep the genetics exclusively within the herds of the [J]oint [V]enture . . . ."); *id.*, at 43-44 (detailing how GenoSource will allegedly "piggyback" off of the years of research and development that Sexing Technologies has undertaken); *id.*, at 54 ("[Sexing Technologies] . . . seeks a preliminary and permanent injunction prohibiting GenoSource from using confidential or proprietary information obtained through the [Joint Venture] . . . ."); *id.*, at 62 ("[Sexing Technologies] also seeks a preliminary and permanent injunction prohibiting GenoSource from using confidential or proprietary information obtained in its confidential relationship with [Sexing Technologies]."); *id.*, at 64, 66 ("GenoSource has tortiously interfered with the . . . Joint Venture Program by . . . [f]acilitating or inducing [Joint Venture] members to sell [to] GenoSource exclusive [Joint Venture] Program animals or semen in violation of the terms of the JV Agreement; and [a]bsconding with [Joint Venture] Animals and Products and improperly competing with the [Joint Venture], and by preparing to market and sell [Joint Venture] Animals and Products."); *id.*, at 78 ("Mr. Rauen [was] given access to [Sexing Technologies'] secure website that included detailed information on [Joint Venture] bulls . . . ."); *id.* (explaining that Mr. Rauen was provided with detailed financial information for the Joint Venture); *id.*, at 80 ("As a further result [of GenoSource's misrepresentations or omissions], GenoSource was . . . able to obtain confidential information of the [Joint Venture] including, but not limited to, [in vitro fertilization] and reproductive information as well as sensitive financial information."); *id.*, at 81 ("Because of its confidential relationship with [Sexing Technologies] and [Joint Venture] members, GenoSource was privy to extensive proprietary and confidential information that was owned or developed by [Sexing Technologies]."); *id.*, at 82-83 (providing an extensive list of "confidential information" that GenoSource had access to "because of Messr. Butz and Rauen's prominent role in the [Joint Venture]"); *id.*, at 83 ("[U]pon information and belief, GenoSource is currently using [Sexing Technologies'] proprietary and confidential information to directly compete with [Sexing Technologies] or in preparation of competing with [Sexing Technologies] and the [Joint Venture].").

On February 5, 2019, the Court held a scheduling conference and subsequently entered a Scheduling Order and Discovery Plan and a Trial Management Order, and the Court set this case for trial commencing on April 13, 2020, with dispositive motions due on October 25, 2019. (Docs. 108, 110, 111). In short, although this case has been pending for a mere four months, the Court has expended a great deal of resources in considering this case, and the Court has become intimately familiar with the parties and with the nuanced factual circumstances surrounding this case.

### III.  THE TEXAS ACTION

On February 20, 2019, Sexing Technologies sued Mr. Butz and Mr. Rauen in the Southern District of Texas seeking both damages and injunctive relief. (*Inguran*, Doc. 1). In addition to its complaint, Sexing Technologies filed a Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 5) and an Emergency Motion for Expedited Discovery in Anticipation of Hearing on Preliminary Injunction Request (Doc. 6). The Southern District of Texas scheduled a hearing on Sexing Technologies' motions for February 27, 2019. (Doc. 7). On February 22, 2019, Mr. Butz and Mr. Rauen, together, filed an Emergency Motion to Transfer and Stay Action Pending Resolution of Motion to Transfer. (Doc. 10). On February 26, 2019, this Court entered its injunctive Order that addressed the Texas Action. (*GenoSource*, Doc. 122). Upon receipt of this Court's Order, the Southern District of Texas cancelled the hearing that was scheduled to take place on February 27, 2019. (*Inguran*, Docs. 13-14). The Southern District of Texas has not ruled on any of the motions that have been filed in that court.

Sexing Technologies' complaint in the Texas Action alleges four claims, two of which sound in trade secret law, one of which alleges violation of the federal Computer Fraud and Abuse Act, Title 18, United States Code, Section 1030, and one of which alleges breach of a confidential relationship. (Doc. 1, at 16-20). In support of its claims, Sexing Technologies asserts that Mr. Butz and Mr. Rauen "had prominent roles" in the

Joint Venture, and that by virtue of those "prominent roles," Mr. Butz and Mr. Rauen participated in making decisions for the Joint Venture, including determining whether animals were "elite," and classifying (or reclassifying) animals accordingly, strategic planning, progeny development and mating preferences, and "other related functions." (*Id.*, at 4-5). Sexing Technologies also asserts that Mr. Butz and Mr. Rauen "were privy to some of the most sensitive information of the [Joint Venture] and its members."[8] (*Id.*, at 5). Additionally, Sexing Technologies alleges that Mr. Rauen, at least, "continued to access [Sexing Technologies'] restricted websites up through and including October 19, 2018." (*Id.*, at 7).

Sexing Technologies' complaint in the Texas Action is premised on the assertion that "[Mr.] Butz and [Mr.] Rauen . . . will compete directly with [Sexing Technologies] and [the Joint Venture], through GenoSource, LLC, an entity they formed and control . . . by marketing and developing [Joint Venture] animals and products . . .." (*Id.*, at 6 (footnote omitted)). Permitting a competitor to use the confidential information which Mr. Butz and Mr. Rauen allegedly possess, Sexing Technologies alleges, "would improperly allow the competitor to 'piggy back' off of years of development, analysis, and research by [Sexing Technologies], and millions of dollars of investments." (*Id.*, at 10 (footnote omitted)).

As an example, Sexing Technologies explains the process of having an animal genomically tested to determine the genomic value of the animal. (*Id.*, at 11-12). The results of genomic testing, Sexing Technologies asserts, are of high proprietary value because the results permit a cattle owner to market the cattle as being of high genetic value. (*Id.*). To determine which animals to genetically test, Sexing Technologies

---

[8] Sexing Technologies provides a more detailed list of "confidential information" that Mr. Butz and Mr. Rauen allegedly had access to "because of their confidential relationship [with Sexing Technologies]." (*See Inguran*, Doc. 1, at 7-9).

develops its own genomic indices that permit Sexing Technologies to predict the value an animal may have in various markets. (*Id.*). These "predictive indices" allow Sexing Technologies to minimize costs by only testing those animals that Sexing Technologies thinks are likely to have high genetic value in certain markets. (*Id.*). The predictive indices for animals that underwent testing at Genetic Visions are stored on Sexing Technologies' internal database, which Mr. Butz and Mr. Rauen allegedly could access by virtue of their relationship with Sexing Technologies and the Joint Venture. (*Id.*, at 12). Sexing Technologies asserts that access to this information would permit Mr. Butz and Mr. Rauen to market their female cattle as high value genetic donors in international markets and that this information would permit Mr. Butz and Mr. Rauen to strategically use the predictive indices as animals become available for auction. (*Id.*).

In the Texas Action, Sexing Technologies seeks monetary damages and injunctive relief. (*Id.*, at 20-21). Specifically, Sexing Technologies seeks a temporary restraining order, subsequent preliminary injunction, and, ultimately, a permanent injunction

> directing [Mr. Butz and Mr. Rauen] and their agents, assignees, servants, employees and attorneys, and all persons in active concert or participation with [Mr. Butz and Mr. Rauen] to be immediately restrained from, and to cease and desist any attempts or efforts, directly or indirectly, toward (a) disclosing, retaining, copying, transferring, conveying, or using in any manner, other than to surrender or return to any authorized representative of [Sexing Technologies], any of [Sexing Technologies'] Confidential Information and any other records, files, and documents of the business of [Sexing Technologies], and copies thereof, whether in written, electronic, or other form, tangible or intangible, and wherever located; and (b) surrender or return to an authorized representative of [Sexing Technologies] any and all documents, data, and other information taken from [Sexing Technologies], including any and all customer lists, customer profiles, customer files, customer communications, price lists, cost data, sales and marketing information, vendor and client contracts, and other internal business records, such as those related to the breeding of animals, including the results of all genomic testing of animals by Genetic Visions for animals not owned by [Mr. Butz or Mr. Rauen]; proprietary genomic indices; the

proprietary EcoFeed indices; proprietary genetic information; lists of oocyte donor production, IVF embryo production, cloning, pregnancies being made, along with embryo reports, pregnancy lists and genetic lists; information such as IVF production of embryos by female sexed semen, male sexed semen, and conventional semen by bull, by donor, by technician, and by location; confidential genetic calculation formulas; lists of prerelease semen and semen inventories; and information regarding [Sexing Technologies'] semen processing.

(*Id.*, at 20-21).   The Court understands the crux of Sexing Technologies' claim for injunctive relief as seeking to prevent Mr. Butz and Mr. Rauen from using any of the information they obtained through their relationships with Sexing Technologies and the Joint Venture.   The Court understands GenoSource to assert that the prohibition Sexing Technologies seeks in the Texas Action would extend to GenoSource through Mr. Butz and Mr. Rauen who, Sexing Technologies asserts, "control" GenoSource.   (*See id.*, Doc. 1, at 6; *GenoSource*, Doc. 113, at 63).

## IV.   APPLICABLE LAW

"The well-established rule is that in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case.'"   *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir. 1990) (quoting *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985)).   The first-filed rule, which is premised on federal comity and seeks to avoid inconsistent decisions and the unnecessary expenditure of judicial resources, "requires that the concurrent cases be brought by the same parties and embrace the same issues."   *Cent. States Indus. Supply, Inc. v. McCullough*, 218 F. Supp. 2d 1073, 1091-92 (N.D. Iowa 2002); *Monsanto Tech. LLC v. Syngenta Crop Prot.*, 212 F. Supp. 2d 1101, 1102 (E.D. Mo. 2002).   "The two cases do not have to be identical but must have issues that substantially overlap."   *Monsanto Tech.*, 212 F. Supp. 2d at 1103.

It is well established that the federal court in which the first-filed action is pending may, in its discretion, "enjoin the parties from proceeding with a later-filed action in another federal court." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1004 (8th Cir. 1993) (citations omitted). The Eighth Circuit Court of Appeals has discussed the nature of injunctive relief that is contemplated under the first-filed rule:

> Injunctions of the sort at issue here, *i.e.*, orders enjoining a party from proceeding with a duplicative, second-filed lawsuit in another forum, are not subject to the *Dataphase* standards for injunctive relief. In a case of this kind, the *Dataphase* factors are inapposite, since the question has nothing to do with the merits of the underlying controversy and is simply whether, as between two courts both having jurisdiction over the parties and the subject matter of the dispute, the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action.

*Id.* (footnote omitted).

"[The] first-filed rule is not intended to be rigid, mechanical, or inflexible, but is to be applied in a manner best serving the interests of justice." *U.S. Fire Ins. Co.*, 920 F.2d at 488 (internal citation and quotation marks omitted). "The prevailing standard is that 'in the absence of compelling circumstances,' the first-filed rule should apply." *Id.*, at 488-89 (citation omitted) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982)). The Eighth Circuit Court of Appeals has recognized two "red flags" that indicate the presence of compelling circumstances: 1) the filing of a lawsuit as "a preemptive strike," or a "race[ ] to the courthouse;" and 2) bad faith. *Nw. Airlines.*, 989 F.2d at 1007. Courts within the Eighth Circuit have also recognized a "balance of convenience" exception and a "dead heat" exception to the first-filed rule. *See, e.g.*, *Barry-Wehmiller Co., Inc. v. Marschke*, No. 4:09CV760 TIA, 2009 WL 3698009, at *2 (E.D. Mo. Nov. 2, 2009); *Terra Int'l v. Miss. Chem. Corp.*, 922 F. Supp. 1334, 1348-54 (N.D. Iowa 1996). "The balance of convenience exception

applies where an analysis under 28 U.S.C. 1404(a) dictates transfer." *Barry-Wehmiller*, 2009 WL 3698009, at *2 (citation and internal quotation marks omitted).

The balance of convenience exception considers the relative convenience to each party in relation to litigating in the first-filed court versus the second-filed. *Terra Int'l*, 922 F. Supp. at 1348-49. The dead heat exception typically applies when two actions are filed in close temporal proximity to each other, though there is no bright line rule dictating when the dead heat exception ceases to be relevant. *Id.* at 1353.[9]

## V.    DISCUSSION

Both of the cases at issue were brought in federal court. One, however, was brought in the Northern District of Iowa, and the other was brought in the Southern District of Texas. The threshold issue of whether the cases were brought in separate forums is thus answered in the affirmative. Additionally, the Iowa Action was filed nearly four months before the Texas Action (*see GenoSource*, Doc. 1; *Inguran*, Doc. 1), and neither party contends that the Texas Action was filed before the Iowa Action. The Court thus concludes that the Iowa Action is the first filed action for purposes of addressing the first-filed rule and notes, again, that the parties do not contend otherwise. Having found that the two actions at issue are pending in separate courts, and having

---

[9] In addressing the dead heat exception, this Court has previously highlighted the importance of considering factors other than just temporal proximity:

> Although the court concludes that there is no 'dead heat' exception [that] stands alone, except in the circumstances of impossibility of determining who filed first, where the filing of the two lawsuits is, practically speaking, a 'dead heat,' as in all other circumstances, the final determination of venue will not depend upon the first-filed rule alone, but upon a balance of the dictates of the rule against other factors.

*Terra Int'l*, 922 F. Supp. at 1353 (footnotes omitted).

found that the Iowa Action was the first of the two actions to be filed, the Court may properly proceed with its analysis under the first-filed rule.

### A. Parallel Proceedings

The Court finds that the Texas Action and the Iowa Action involve the same parties and embrace the same issues, which leads the Court to find that the Texas Action and the Iowa Action are, in fact, parallel proceedings. *McCullough*, 218 F. Supp. 2d at 1091-92 ("[T]he first-filed rule requires that the concurrent cases be brought by the same parties and embrace the same issues." (citations omitted)). Inguran, *doing business as* Sexing Technologies, is a party to both cases, and neither GenoSource nor Sexing Technologies contends that the presence of Hawkeye in the Iowa Action affects the first-filed rule analysis. Thus, the material issue, in terms of the parties named to each action, is whether Mr. Butz and Mr. Rauen, as parties to the Texas Action, and GenoSource, as a party to the Iowa Action, should be considered the same parties for purposes of the first-filed rule. The Court finds that they should.

### 1. Same Parties

At the core of Sexing Technologies' claims in the Texas Action is the allegation that Mr. Butz and Mr. Rauen used their relationships with Sexing Technologies and the Joint Venture to gain allegedly confidential information about Sexing Technologies then subsequently used, or plan to use, that information, through GenoSource, to compete with Sexing Technologies. Likewise, in the Iowa Action, many of Sexing Technologies' claims and defenses revolve around the allegation that Mr. Butz and Mr. Rauen gained allegedly confidential information through their relationships with Sexing Technologies and the Joint Venture, which GenoSource may use to compete with Sexing Technologies by virtue of GenoSource's relationship with Mr. Butz and Mr. Rauen. In other words, in the Texas Action, Sexing Technologies asserts that Mr. Butz and Mr. Rauen committed allegedly wrongful acts through GenoSource, while in the Iowa Action, Sexing

Technologies asserts that GenoSource committed allegedly wrongful acts through Mr. Butz and Mr. Rauen.

In both cases, the allegedly wrongful actors are Mr. Butz and Mr. Rauen, and in both cases, the vehicle for the wrongful conduct is alleged to be the unnamed party—GenoSource in the Texas Action, and Mr. Butz and Mr. Rauen in the Iowa Action. It follows that the allegations cannot exist in the same material form in either action absent either GenoSource or Mr. Butz and Mr. Rauen. All three parties—GenoSource, Mr. Butz, and Mr. Rauen—are integral to both the Texas Action and the Iowa Action. By nature of the pleadings alone, the Court is satisfied that the parties to each action are the same, for purposes of the first-filed rule. *See Nash*, 724 F. Supp. 2d at 1168 ("[T]he parties need not be identical . . .. The inquiry is whether there is substantial overlap between the parties and issues, and the overarching goal is to avoid inconsistent rulings between the two cases.").

### 2. *Same Issues*

For purposes of the first-filed rule, the Court must consider whether the *issues*, not *claims*, in the Texas Action are the same as those in the Iowa Action. *McCullough*, 218 F. Supp. 2d at 1091-92. The Court finds that central issues in the two cases are the same in many respects and that the first-filed rule is implicated as a result. Although GenoSource is not a named party to the Texas Action, and although Mr. Butz and Mr. Rauen are not named parties to the Iowa Action, both cases turn on the actions of the two individuals. Sexing Technologies has also consistently alleged that Mr. Butz and Mr. Rauen "control" GenoSource, which indicates that even though GenoSource is the named party in the Iowa Action, Sexing Technologies' theory will necessarily implicate the actions and/or decisions that Mr. Butz and Mr. Rauen took and made that led to the allegedly wrongful conduct. As a result, Mr. Butz's and Mr. Rauen's conduct will be a central issue in both cases.

More specifically, the two lawsuits contain significant overlap as to the type of allegedly wrongful conduct that Mr. Butz and Mr. Rauen are alleged to have undertaken. For example,[10] both actions allege that Mr. Butz and Mr. Rauen became privy to Sexing Technologies' confidential information through their relationships with Sexing Technologies and the Joint Venture, and that Mr. Butz and Mr. Rauen are now working with GenoSource to use that confidential information in an allegedly inappropriate fashion. In the Texas Action, the alleged misuse forms the basis for Sexing Technologies' trade secret claims, while the same alleged misuse forms the basis for Sexing Technologies' tortious interference claim in the Iowa Action.

Similarly, the Texas Action includes a count for violation of the federal Computer Fraud and Abuse Act, which appears to revolve around Mr. Rauen's alleged practice of "continu[ing] to access [Sexing Technologies'] restricted websites up through and including October 19, 2018." (*Inguran*, Doc. 1, at 7, 19 (footnote omitted)). The same alleged practice of continuing to access Sexing Technologies' "restricted websites" is included as a factual assertion offered in support of Sexing Technologies' fraud and fraudulent inducement claim in the Iowa Action. (*GenoSource*, Doc. 113, at 78 ("Mr. Rauen remained silent when given access to [Sexing Technologies'] secure website that included detailed information on [Joint Venture] bulls, including GenoSource bulls. As a result, GenoSource left [Sexing Technologies] with a false impression that GenoSource was a member of the [Joint Venture].")).

This Court has also already received into evidence spreadsheets that Mr. Rauen apparently "downloaded off of [Sexing Technologies'] computer systems." (*Inguran*, Doc. 5, at 6). This Court cannot know, presently, whether the Texas computer fraud

---

[10] The overlapping issues discussed here are only *examples* of the overlap between the issues presented in the Texas Action and in the Iowa Action. The Court finds it unnecessary to discuss all of the instances of overlap to find that the first-filed rule is properly implicated.

claim is intended to encompass the use of the spreadsheets that were introduced into evidence in the Iowa Action. The correlary is that the Court cannot know whether the introduction of the spreadsheets into evidence in the Iowa Action will become an issue in the Texas Action. The Court can state, however, that the introduction of the spreadsheets into evidence in the Iowa Action shows that this Court has already become familiar with the somewhat broader issue of Mr. Rauen's use of Sexing Technologies' databases and websites. Thus, although the discrete issue of the usage of the spreadsheets may not arise in both cases, the preliminary issue of Mr. Rauen's use of Sexing Technologies' websites and the information obtained from those websites has already become an issue in both cases and, arguably, more so in the Iowa Action by virtue of the spreadsheets having been received into evidence.

The issue of which company conducted genomic testing on certain animals is also at issue in both cases. As detailed *supra*, Sexing Technologies alleges that for those animals that underwent genomic testing at Genetic Visions, Mr. Butz and Mr. Rauen had access to Sexing Technologies' allegedly proprietary predictive indices. This information, Sexing Technologies argues in the Texas Action, would permit Mr. Butz and Mr. Rauen to unfairly market those animals that they own that underwent testing at Genetic Visions, and would also permit Mr. Butz and Mr. Rauen to unfairly compete with Sexing Technologies at cattle auctions. (Doc. 1, at 12-13). Determining the animals for which Mr. Butz and Mr. Rauen allegedly have Sexing Technologies' proprietary predictive indices would require an inquiry into which animals underwent genomic testing at Genetic Visions. In the Texas Action, Sexing Technologies also seeks the return "of all genomic testing of animals by Genetic Visions for animals not owned by [Mr. Butz or Mr. Rauen]." (Doc. 1, at 21). Were the Southern District of Texas inclined to grant the relief requested, it would be necessary to inquire into which animals belonging to Mr. Butz or Mr. Rauen underwent testing at Genetic Visions.

In the Iowa Action, one of the examples of a breach of the JV Agreement[11] to which Sexing Technologies refers is a cow's daughters undergoing genomic testing at a company other than Genetic Visions. (*GenoSource*, Doc. 113, at 51). That this conduct was provided as an example of GenoSource's alleged breaches indicates that there could be additional animals that underwent testing at a company other than Genetic Visions. If GenoSource was a party to a contract containing similar terms as the JV Agreement, ascertaining GenoSource's alleged breaches would require an inquiry into which GenoSource animals underwent genetic testing at a company other than Genetic Visions. The Texas Action would require the same inquiry on a broader scale; that is, the Texas Action would require an inquiry into the company that provided genetic testing for all animals in Sexing Technologies' database, while the Iowa Action would require the narrower inquiry of which company provided genetic testing for each of GenoSource's animals.[12] The necessary inquiry in the Iowa Action could be answered through the broader inquiry that would be necessitated in the Texas Action because if a GenoSource animal was known to have undergone genomic testing, but the test results are not reflected in Sexing Technologies' database, that animal will be known to have undergone testing with a company other than Genetic Visions. The issue of where the animals underwent genetic testing has, therefore, arisen in both cases.

---

[11] The Court notes that there is a dispute as to whether GenoSource was a party to a contract with Sexing Technologies and, if so, whether that contract contained the same terms as the JV Agreement.

[12] The Court does not presently have enough information to determine which animals should be considered "GenoSource animals." If animals belonging to either Mr. Butz or Mr. Rauen should be considered "GenoSource animals," then the inquiry necessitated in the Iowa Action would be the exact inquiry necessitated in the Texas Action, were the Southern District of Texas inclined to grant the injunctive relief requested for the return of Genetic Visions testing data.

Perhaps most striking is the relationship between the injunctive relief sought in the Iowa Action and the Texas Action. The injunctive relief sought in the Texas Action is detailed above and includes preliminary injunctive relief "[e]njoining and restraining [Mr. Butz and Mr. Rauen] from making use of confidential, proprietary, and trade secret information belonging to [Sexing Technologies], for any reason, including solicitation of [Sexing Technologies'] customers and the breeding of [Mr. Rauen's and Mr. Butz's] animals." (*Inguran*, Doc. 5, at 13). Although the Court has not been made aware of how essential the allegedly "confidential, proprietary, and trade secret information" would be to GenoSource in attempting to breed GenoSource's animals, to the best of the Court's understanding, the information would be of benefit in GenoSource's endeavors to breed animals of increasing genetic value. If GenoSource were deprived of that information, GenoSource would likely be hindered—though not necessarily prevented—in its attempts to enter the bull stud market.

In ruling on GenoSource's motion for a preliminary injunction, this Court found that "[t]he public interest would be served . . . by [GenoSource] entering the bull stud market" because GenoSource's entry into the bull stud market would increase competition in the long term. *GenoSource*, 2018 WL 6978126, at *17. The Court's finding that the public interest would be served by permitting GenoSource to enter the bull stud market served as part of the Court's basis for granting preliminary injunctive relief. *See id.* at *17-18 (balancing all relevant factors, including the public interest, to be considered when injunctive relief is sought). Were the Southern District of Texas to grant Sexing Technologies' request to enjoin GenoSource from using the allegedly proprietary and confidential information to breed animals, one of this Court's reasons for granting injunctive relief would likely be undermined. The result would be competing judicial analyses, which is the very type of result that the first-filed rule is intended to combat. *See McCullough*, 218 F. Supp. 2d at 1091-92.

The Court recognizes that should Sexing Technologies ultimately show that the information is trade secret information, enjoining GenoSource from using that information to breed animals could be an appropriate remedy. Sexing Technologies' specific request for injunctive relief in the Texas Action is made, however, in a request for a temporary restraining order and preliminary injunction, which means that any order on Sexing Technologies' motion would be based on *preliminary* findings of fact, not ultimate findings of fact. *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to provide his case in full at the preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." (citations omitted)). Similarly, this Court's finding that the public interest would be served by facilitating GenoSource's entry into the bull stud market was based on preliminary findings of fact and did not contemplate the right to use the allegedly proprietary information. *GenoSource*, 2018 WL 6978126, at *1 n.2. Thus, were the Southern District of Texas to enjoin Mr. Butz and Mr. Rauen[13] from using the information to breed cattle, the result would be two competing judicial opinions, neither of which would be based on a more final factual record than the other. The Court thus concludes that the relief sought in the two cases is, at least in part, the same, for purposes of the first-filed rule.

Finally, Mr. Butz and Mr. Rauen are members of GenoSource, which is a limited liability company. Sexing Technologies has professed an intent to pierce the corporate veil existing between GenoSource and its members, which would include Mr. Butz and

---

[13] The Court notes that if Mr. Butz and Mr. Rauen were enjoined from using the information, that prohibition would likely extend to GenoSource under Federal Rule of Civil Procedure 65(d)(2).

Mr. Rauen. Sexing Technologies' pleadings indicate an intent to prove that Mr. Butz and Mr. Rauen acted tortiously. Should Sexing Technologies succeed in piercing the corporate veil, and should Sexing Technologies prove that Mr. Butz and Mr. Rauen acted tortiously, Mr. Butz and Mr. Rauen, along with the rest of GenoSource's members, could be deemed liable for their tortious conduct in the Iowa Action. *E.g. Estate of Countryman v. Farmers Co-Op Ass'n*, 679 N.W.2d 598, 603 (Iowa 2004).[14] This finding of individual liability is the exact finding that Sexing Technologies seeks in the Texas Action.

In light of the substantial overlap in the issues that must be addressed in the Texas Action and the Iowa Action, the Court finds that the issues in the two cases should be considered to be the same for purposes of the first-filed rule, as should the parties. The Court thus concludes that of the two cases, the Iowa Action has priority to proceed. *See U.S. Fire Ins.*, 920 F.2d at 488. The Court will now consider the exceptions to the first-filed rule for which Sexing Technologies has offered argument.

### B. Exceptions to the First-Filed Rule

Sexing Technologies argues that the "compelling circumstances" exception and the "balance of convenience" exception apply such that the first-filed rule is defeated. The Court finds that Sexing Technologies' proffered arguments do not amount to compelling circumstances to disregard the first-filed rule, nor do principles of equity persuade the Court that Sexing Technologies should be permitted to pursue the Texas Action concurrently with the Iowa Action. Neither of the two "red flags" that the Eighth Circuit Court of Appeals has recognized is at issue here, so the Court must determine

---

[14] The parties have not addressed which body of law would be implicated in assessing the potential liability of GenoSource's members. GenoSource appears to be organized under the laws of the State of Iowa, and the Court thus references Iowa law by way of illustration only. The citation to Iowa law on this issue is not to be deemed a determination of the applicable body of law.

whether other facts amount to "compelling circumstances." *See Nw. Airlines*, 989 F.2d at 1007.

Although each case may implicate certain issues that are not shared by the other case, the "first-filed rule is not intended to be rigid, mechanical, or inflexible, but is to be applied in a manner best serving the interests of justice." *U.S. Fire Ins. Co.*, 920 F.2d at 488. The Texas Action and the Iowa Action are both extremely complex and share the same core set of facts and a great number of overlapping issues. To litigate the two cases separately would require two separate courts to expend valuable resources to resolve many of the same issues against the same parties. This Court, as detailed above, has already become familiar with the facts and parties involved in the two cases and has already expended significant resources in holding hearings and ruling on the various motions that have come before the Court.

The Southern District of Texas, by contrast, has had almost no involvement with the Texas Action, beyond setting and then cancelling a hearing on Sexing Technologies' motion for injunctive relief. (*See Inguran*, Docs. 7, 14). Indeed, the Texas Action was pending for only two days before the instant motion came before this Court (*compare Inguran*, Doc. 1 *with GenoSource*, Doc. 114), and the Texas Action was pending for less than one week when this Court enjoined Sexing Technologies "from taking any further action in, and from taking any action to prosecute" the Texas Action (*GenoSource*, Doc. 122). The Eighth Circuit Court of Appeals has granted deference to a second-filed court, in part, because the case had been further developed in the second-filed court than in the first. *Orthmann*, 765 F.2d at 121. The Texas Action has not been developed further than the Iowa Action. Indeed, the Iowa Action has been significantly more developed than the Texas Action. Thus, *Orthmann* is distinguishable from the instant case and does not dictate that this Court should yield to the Southern District of Texas.

Although Sexing Technologies argues that this Court is not familiar with the issues of Sexing Technologies' alleged trade secrets and confidential information, the Court disagrees. (Doc. 120, at 9-10). The issue of confidential information has come up frequently throughout the proceedings here, even if for a purpose other than its potential value as being trade secret information. Even if this Court were not familiar with the issues of Sexing Technologies' alleged trade secrets and confidential information, however, this Court certainly has more context and background on the issues than the Texas court, as is shown by comparing the proceedings and involvement of the court in each case thus far. Under either line of reasoning, this Court is better poised than the Southern District of Texas to put the trade secret and confidential information issues into context. Were the Southern District of Texas to consider these issues, that court would first have to familiarize itself with the background of the two cases, which this Court has already done. Finally, even if this Court were not better positioned to consider the trade secret and confidential information issues, this Court is certainly not in a *worse* position than the Southern District of Texas to consider those issues.

Sexing Technologies also asserts that "[t]he Texas [c]ourt is better situated to apply Texas law, which governs the JV Agreement and the claims in the Texas Action." (*Id.*, at 9). Although the Texas court may very well be in a better position than this Court to consider issues of Texas law, Sexing Technologies' assertion is at odds with the remainder of Sexing Technologies' litigation strategy. Sexing Technologies has argued, and continues to argue, that GenoSource was and is a party to the JV Agreement. (*See, e.g.*, Docs. 27, at 14-20; 113, at 71 ("[Sexing Technologies] seeks declaratory relief that GenoSource is still a party to the JV Agreement, is in breach of the JV Agreement, and does not have grounds to terminate the JV Agreement.")). The JV Agreement contains a Texas choice of law provision. (*See* Doc. 61-2, at 75). Thus, in maintaining its argument that GenoSource is a party to the JV Agreement, Sexing Technologies is, by implication,

arguing for the application of Texas law to the Iowa Action with respect to the JV Agreement and those claims stemming from the JV Agreement.

Five of Sexing Technologies' fourteen claims in the Iowa Action are also asserted under Texas law. (Doc. 113, at 47, 62, 63, 67, 73 (arguing that GenoSource is liable under both Iowa law and Texas law). In the Texas Action, only two of Sexing Technologies' four claims are predicated on Texas law. (*Inguran*, Doc. 1, at 17, 19). The Court does not question the legitimacy of Sexing Technologies' assertion that the Southern District of Texas is better situated to consider questions of Texas law. Here, however, the claim that the Southern District of Texas should take priority because Texas law is implicated is inconsistent with the remainder of Sexing Technologies' litigation strategy. The Court thus finds that Sexing Technologies' arguments for the applicable body of law are insufficient to overcome the first-filed rule.

Sexing Technologies also argues that enjoining litigation from proceeding in the Texas Action would "deprive [Sexing Technologies] of any immediate relief . . . exposing [Sexing Technologies] and the [Joint Venture] to immeasurable and irreparable harm." (GenoSource, Doc. 120, at 9). If Sexing Technologies were to take no action in response to this Court's grant of injunctive relief as to the Texas Action, perhaps Sexing Technologies would be correct. Sexing Technologies has indicated, however, that it believes it could present this Court with a motion similar to the motion for injunctive relief that Sexing Technologies filed in the Texas Action. (*See* Doc. 140, at 23-24). The Court is, therefore, less concerned with Sexing Technologies' claim that it would be without "immediate relief" if Sexing Technologies were enjoined from pursuing the Texas Action.

Finally, Sexing Technologies argues that the balance of convenience exception to the first-filed rule counsels that the parties should be permitted to proceed with the Texas

Action.[15]  (Doc. 120, at 10).  To the best of the Court's understanding, Sexing Technologies argues that because Mr. Butz and Mr. Rauen are identified in the JV Agreement, their participation in the Joint Venture has been "woven into" the JV Agreement.  (*Id.*).  By virtue of being "woven into" the JV Agreement, the Court understands Sexing Technologies to argue that it naturally follows that any litigation against Mr. Butz and Mr. Rauen would proceed in Texas, under the Texas forum selection provision contained in the JV Agreement.  Sexing Technologies also asserts that with arbitration proceedings ongoing in Texas, for which Mr. Butz and Mr. Rauen will need to be present, neither individual would be inconvenienced by having to litigate in Texas.  Without accepting or rejecting Sexing Technologies' equitable arguments, the Court finds that the reasons set forth by Sexing Technologies are insufficient to overcome the first-filed rule.  Even if each of the asserted equitable considerations weighs in Sexing Technologies' favor, these factors do not weigh heavily enough to outweigh the first-filed rule.  The Court also notes that the claims in the Texas Action do not sound in contract law and, so, cannot explicitly implicate a forum selection clause that is contained in any agreement, including the JV Agreement.

Having considered the parties' arguments, the Court finds that the Texas Action and the Iowa Action are parallel proceedings and that the first-filed rule is thus invoked. The Court also finds that none of the exceptions to the first-filed rule for which Sexing Technologies has offered argument is applicable to the instant actions.  Thus, the Court concludes that the Iowa Action, as the first-filed proceeding, should take priority.  The

---

[15] The Eighth Circuit Court of Appeals has laid out the factors to be considered in a balance of convenience analysis: 1) the convenience of the parties; 2) the convenience of the witnesses; 3) the interests of justice; and 4) any other relevant factors when comparing alternative venues. *Terra Int'l v. Miss. Chem. Corp.*, 119 F.3d 688, 696 (8th Cir. 1997).  The Court will address only those factors that the parties have addressed.

Court's February 26, 2019 Order, reflected on the Northern District of Iowa's docket at entry number 122, remains in full force and effect pending further order of this Court.

## VI.    CONCLUSION

For all of these reasons, the Court finds that the Texas Action and the Iowa Action are parallel proceedings and that the first-filed rule is implicated.  The Court also finds that no exceptions to the first-filed rule apply and that the Iowa Action should take priority over the Texas Action.  The Court's February 26, 2019 Order enjoining Inguran, LLC, doing business as Sexing Technologies "from taking any further action in, and from taking any action to prosecute, the action filed in the Southern District of Texas, bearing case number 4:19-cv-00574, and which is styled *Inguran, LLC dba Sexing Technologies v. Mark Butz, Tim Rauen*," is to remain in full force and effect, pending further order of this Court.  (*See* Doc. 122).

**IT IS SO ORDERED** this 14th day of March, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa